# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1950-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANECY,

     Plaintiff-Respondent,

v.

N.M.B.,

     Defendant,

and

J.S.,

     Defendant-Appellant.

_____

IN THE MATTER OF N.S. and
K.S., minors.

_____

Submitted April 30, 2025 – Decided July 18, 2025

Before Judges Mayer and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FN-03-0131-21.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Kathleen A. Gallagher, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Lakshmi R. Barot, Deputy Attorney General, on the brief).

PER CURIAM

In this Title Nine action, defendant J.S. (James)[1] appeals from a September 19, 2022 Family Part order, made final by a January 24, 2024 order terminating litigation, finding he abused or neglected his four-month-old son, K.S. (Kyle), who inexplicably sustained a head injury in James's care. Because we conclude there was sufficient credible evidence in the record supporting the family judge's decision, we affirm.

I.

Judge Lisa James-Beavers conducted the multi-day fact-finding hearing, during which the Division of Child Protection and Permanency (DCPP)

---

[1] Consistent with the parties' briefs, we use initials to preserve the confidentiality of the proceedings, R. 1:38-3(d)(12), and pseudonyms for ease of reference.

2                                                                          A-1950-23

presented the testimony of Anish Raj, M.D., Kyle's treating physician and expert in pediatric child abuse; a DCPP intake worker; and Detective Sean Tait of the Burlington County Prosecutor's Office (BCPO). DCPP moved into evidence Kyle's medical records and other reports.

James did not testify but presented the testimony of his father, D.S. (David), and Joseph Scheller, M.D., a pediatric neurology and neuroimaging expert. James moved into evidence his statement to police and Dr. Scheller's report.

The Law Guardian did not present any evidence and took no position on the Title Nine finding. However, the Law Guardian did not dispute DCPP sustained its burden and expressly asserted Dr. Scheller's testimony lacked credibility.

In her oral decision spanning nearly forty transcript pages, Judge James-Beavers detailed her factual and credibility findings in view of the governing legal principles. We incorporate the judge's findings by reference, highlighting those pertinent to this appeal.

A-1950-23

James and N.M.B. (Nicole)[2] are the biological parents of N.S. (Neal), born in August 2018, and Kyle, born in August 2020. The family resides together in a two-bedroom apartment in the City of Burlington.

The allegations of abuse or neglect arose from Kyle's second hospitalization within three days in January 2021. On January 1, 2021, Nicole left Kyle and Neal at their home with James while she drove her seven-year-old niece to her home in Trenton after a brief visit. Later that same night, Nicole noticed Kyle was acting "fussy." The next day, Kyle did not eat as much as usual and slept more frequently.

On January 3, Nicole brought Kyle to Virtua Hospital's emergency room. An ultrasound of his abdomen and a neck x-ray were performed with negative results, but the hospital did not take any images of his head. Kyle was diagnosed with dehydration and discharged the following day. While home on January 5, Nicole noticed Kyle seemed to be in pain when he was touched.

On January 6, Nicole left Kyle and Neal alone with James for about fifty minutes while she shopped for groceries. Upon her return, James disclosed when he changed Kyle's diaper, he "notic[ed] that [Kyle] was breathing kind of

---

[2] Nicole is not a party to this appeal.

heavy" and not "squirming" as he usually did.  Because Kyle's "hands start[ed] tightening up," Nicole suspected he was having a seizure and called 9-1-1.

Kyle was admitted to Virtua Hospital with a skull fracture, intercranial bleeding, retinal hemorrhages in both eyes, and possible Shaken Baby Syndrome.  He was transferred to the Children's Hospital of Philadelphia (CHOP) and admitted to the pediatric intensive care unit.  Kyle remained at CHOP for two weeks before he was discharged to his parents.

Because Nicole and James were unable to explain the cause of Kyle's injuries, the hospital team opined the injuries were "highly concerning for non-accidental trauma (child abuse)" and made a referral to DCPP.  DCPP, in turn, reported CHOP's findings to the BCPO.  Following BCPO's investigation, James was charged with second-degree endangering the welfare of a child and fourth-degree child abuse.  On a date unclear from the record, James pled guilty to third-degree child endangerment and was sentenced to a probationary term.[3]

In May 2021, DCPP was awarded care and supervision of both children.  Following its investigation, DCPP substantiated allegations against James for abuse and neglect of Kyle.  Finding Nicole "took all appropriate steps as a

---

[3]  DCPP requests this court take judicial notice of defendant's conviction but failed to include the judgment of conviction in its appellate appendix.  James does not, however, dispute the disposition.

caregiver to care for [Kyle]," DCPP concluded abuse and neglect was "not established" against her.

During the fact-finding hearing, Dr. Raj testified he reviewed Kyle's medical records and examined Kyle in the hospital. Dr. Raj explained Kyle suffered a skull fracture and intercranial bleeding with retinal hemorrhaging in both eyes. Although he was unable to date the injury, Dr. Raj opined swelling to the head typically occurs "within 24 hours" of impact.

Dr. Raj ruled out certain causes that might have led to Kyle's injuries. He testified Kyle did not have a genetic condition or predisposition; there was no indication the injuries were caused during childbirth; and a four-month-old child with limited mobility would not self-sustain the injuries. Rather, Dr. Raj opined such injuries usually were caused by "a significant unambiguous accident or non-accidental inflicted trauma." He testified the "significant" amount of bleeding in Kyle's brain suggested "abusive head trauma." Dr. Raj reasoned, "[i]t just doesn't make sense that this would happen spontaneously. So, something happened, I just can't tell you what happened." He rejected Dr. Scheller's competing opinion that Kyle's injuries were accidental "because there [was] no accident event that was ever disclosed or reported." Dr. Raj concluded, "in the absence of any known accidental offense . . . [his] best medical diagnosis

6

was inflicted trauma or non-accidental trauma, which would be child physical abuse."

DCPP's intake worker testified about the parents' interviews. She noted Nicole said Kyle was not "left alone or unsupervised with any other individual other than herself and [James]." The intake worker explained child abuse allegations were substantiated only against James, in part, because Nicole "g[a]ve a distinct timeline of when she was with [Kyle]" while James could not specify a timeline for "any of the events that occurred."

Tait testified he conducted James's interview. During his interview, James suggested multiple explanations as to how Kyle was injured, including: Nicole could have dropped him; he could have hit his head on the bassinet; Neal, then two-and-one-half years old, may have hit Kyle with something; or Nicole's niece injured Kyle, even though James acknowledged the niece was never alone with Kyle. Tait testified he also consulted with Kyle's doctors and obtained a search warrant for Nicole's and James's cell phone records. Tait explained James was arrested primarily in view of the onset of Kyle's symptoms after he was in James's sole care on January 1, 2021 and Kyle's seizure after he was left in James's sole care on January 6, 2021.

A-1950-23

Dr. Scheller reviewed Kyle's medical records but, unlike Dr. Raj, did not personally examine the child. Dr. Scheller testified about the limited ways in which Kyle could have sustained his injuries, including Kyle: fell on his head; rolled over on his own or was dropped; or was struck on the back of his head. Dr. Scheller further opined the injury was caused between January 2 and January 6, 2021. He noted, unlike other children who have been abused, Kyle did not have any bruises or other fractures. As to whether the injury was caused by an act of violence or an accident, Dr. Scheller testified "there's no way I can possibly know." Dr. Scheller disagreed with Dr. Raj's opinion that Kyle's injuries were caused by non-accidental trauma or child abuse, stating he did not want to "jump to evil . . . if there [we]re other possibilities."

Employed by the Department of Children and Families, James's father, David, testified he never observed any concerns about the family. By contrast, David testified he believed something might have happened to Kyle when he initially was hospitalized on January 3, 2021 because the child was released "so suddenly" and re-hospitalized a short time later. David did not believe James hurt Kyle. He described James as a "loving person" who "loves his kids."

In her comprehensive opinion, Judge James-Beavers carefully summarized the testimony and evidence presented at the hearing. Crediting the

testimony of DCPP's witnesses, the judge found DCPP proved by a preponderance of the evidence that James abused or neglected Kyle pursuant to N.J.S.A. 9:6-8.21(c)(4)(b). For example, the judge found the intake worker's testimony "credible because she did a very thorough investigation of this case," which included the worker's assessment of James's various accounts of the events leading to Kyle's hospitalization. Although the judge generally found David credible, she rhetorically asked, "what father could think a son capable of causing such abuse to a child?" The judge was unpersuaded by David's testimony that he "never saw any [violent] behavior of his son."

The judge found the timeline for Kyle's injuries commenced on January 1 and ended on January 6, 2021, and James had the opportunity to cause Kyle's injuries because he was home alone with the child on January 1 and January 6. The judge credited Tait's observations "that after [Nicole]'s trip to Trenton, there was an issue with [Kyle]. And after [Nicole]'s trip to [the grocery store, Kyle] suffered a seizure."

Judge James-Beavers further determined Dr. Raj "the more credible of the two experts." She noted Dr. Raj concluded, in the absence of a reported accident, "the cause of [Kyle]'s injuries was abusive head trauma." The judge explained Dr. Scheller admitted "his opinion [was] out of line with the vast

majority of experts in his field." She found his "conclusion that it was not abuse [did] not make sense when one considers that there was no accident reported."

Citing our Supreme Court's decision in New Jersey Division of Child Protection & Permanency v. J.R.-R., 248 N.J. 353, 378 (2021), the judge recognized the burden of proof "can be met by drawing rational inferences consistent with N.J.S.A. 9:6-8.46(a)(2)." The judge found Dr. Raj's testimony, "along with all the other testimony in evidence, provided the rational inference in that child abuse science is one in which other causes are ruled out." The judge found all other potential causes of Kyle's injuries were ruled out after a "painstaking investigation" and no other explanation was supported by the facts. The judge therefore concluded DCPP met its burden of proving "the allegation [was] more likely true than not true."

On appeal, James challenges the judge's findings, arguing the abuse or neglect finding is not supported by substantial credible evidence in the record. He argues Kyle's injuries, alone, did not satisfy a finding of abuse because "the medical evidence established" the child's injuries could have been "either accidental or non-accidental." He further contends the record lacks physical evidence indicating how the injuries occurred and the "absence of an explanation" did not support the conclusion Kyle was abused. James also argues

he "was not Kyle's sole caregiver during the relevant period" and, as such, DCPP failed to establish Kyle was under James's supervision when he was injured. He claims the evidence does not demonstrate "the injuries occurred during the two brief time periods James was alone with Kyle."

Before us, consistent with the position taken before the trial judge, the law guardian filed a letter of non-participation expressing no position on the outcome of this appeal.

## II.

Our standard of review of the Family Part's fact-finding determination is circumscribed. See N.J. Div. of Youth & Fam. Servs. v. R.D., 207 N.J. 88, 112 (2011). On appeal from orders issued in Title Nine cases, we accord considerable deference to the trial court's credibility determinations and findings of fact, as long as those findings are supported by "competent, material and relevant evidence." N.J.S.A. 9:6-8.46(b); see also N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369-70 (2017).

We intervene only "if the trial court's conclusions are 'clearly mistaken or wide of the mark.'" N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 227 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). We also owe no deference to the trial court's legal conclusions, which

11

we review de novo. <u>N.J. Div. of Child Prot. & Permanency v. V.E.</u>, 448 N.J. Super. 374, 384 (App. Div. 2017).

Title Nine cases are fact sensitive, and the court should "base its findings on the totality of circumstances." <u>N.J. Div. of Youth & Fam. Servs. v. V.T.</u>, 423 N.J. Super. 320, 329 (App. Div. 2011). Notably, the Title Nine proof standard is less stringent than in guardianship cases for the termination of parental rights, which instead must be proven by clear and convincing evidence. <u>See</u> <u>R.D.</u>, 207 N.J. at 113.

Pertinent to this appeal, an "abused or neglected child" under Title Nine means

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

A court need not wait until a child is actually harmed or neglected before it can act in the welfare of that minor. <u>See</u> <u>N.J. Div. of Child Prot. & Permanency v. E.D.-O.</u>, 223 N.J. 166, 178 (2015). "In the absence of actual harm, a finding of abuse and neglect can be based on proof of imminent danger

and substantial risk of harm." N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 23 (2013) (citing N.J.S.A. 9:6-8.21(c)(4)(b)). "Any allegation of child neglect in which the conduct of the parent or caretaker does not cause actual harm is fact-sensitive and must be resolved on a case-by-case basis." E.D.-O., 223 N.J. at 192.

Our Supreme Court has explained a minimum degree of care is "conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 178 (1999). A parent "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017) (quoting G.S., 157 N.J. at 181). "The focus in abuse and neglect matters . . . is on promptly protecting a child who has suffered harm or faces imminent danger." A.L., 213 N.J. at 18 (citing N.J.S.A. 9:6-8.21(c)(4)).

Accordingly, "[t]he prevailing concern in abuse and neglect cases is the best interests of the child." N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 146 (App. Div. 2016); see also N.J.S.A. 9:6-8.8(a) (providing that under Title Nine, children's safety is "of paramount concern and the best interests of the child shall be a primary consideration"). "The purpose of a fact-

finding hearing in an abuse or neglect proceeding is not to assign guilt to a defendant, but to determine whether a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.44." V.T., 423 N.J. Super. at 328.

In a Title Nine fact-finding hearing,

> proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie evidence that a child of, or who is the responsibility of such person is an abused or neglected child.
>
> [N.J.S.A. 9:6-8.46(a)(2).]

As the Court explained in J.R.-R., "if the injury is one that ordinarily would not occur in the absence of abuse or neglect, if the child was under the supervision of a parent, and if there is no indication the injury was the result of a mere accident, then DCPP has presented prima facie evidence of abuse or neglect." 248 N.J. at 371. Because the inference is permissive, the fact-finder is "'free to accept or reject' it." Ibid. (quoting McDaid v. Aztec W. Condo. Ass'n, 234 N.J. 130, 144 (2018)).

Prior to the Court's decision in J.R.-R., family courts were permitted to shift the burden to the parents to prove non-culpability after DCPP presented a prima facie case of abuse or neglect based on a child's injuries. Id. at 359-60. In J.R.-R., the Court clarified, although a child's injuries may establish a prima

facie case, the burden of proof remains with DCPP.  Id. at 376.  "[T]he statute merely allows for the drawing of an inference from evidence."  Id. at 370.  Courts must then determine "whether DCPP has presented a preponderance of 'competent, material and relevant evidence' to prove the culpability of a parent."  Id. at 376 (quoting N.J.S.A. 9:6-8.46(b)).

The proofs adduced before Judge James-Beavers sufficiently met these well-established standards.  Although the exact cause of Kyle's injuries was not determined, the record contains sufficient evidence that all other causes – except non-accidental trauma – were ruled out by the medical professionals and the investigations conducted by DCPP and BCPO.  Thus, there was "no indication the injury was the result of a mere accident," and DCPP demonstrated Kyle was under the supervision of James during the relevant time period.  See id. at 371.

Moreover, the judge determined Dr. Raj, who examined Kyle and opined the injury was the result of non-accidental trauma, was more credible than Dr. Scheller, who did not treat Kyle.  See N.J. Div. of Child Prot. & Permanency v. C.R.A.G., 479 N.J. Super. 504, 533 (App. Div. 2024) (holding expert testimony can "support a prima facie finding of abuse or neglect based on a child's physical injuries").  The judge also noted James's unresponsive answers during his

interview negatively impacted his credibility and she could not "make sense of [James]'s explanation of what happened."

Applying our limited scope of review and well-established legal standards, we are satisfied there was competent, credible evidence in the record to support the judge's finding James abused or neglected Kyle. The totality of the circumstances cited by Judge James-Beavers support her conclusion that the child was abused or neglected within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1950-23